**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
286 Madison Avenue, 11th Floor
New York, NY 10017
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens
Lauren C. Kiss
Kevin B. Collins

*Counsel to Plaintiff Fred Stevens, Plan Administrator*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>PRIME CAPITAL VENTURES, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 24-11029 (PGR) |
| FRED STEVENS, as Plan Administrator, and as assignee of third-party claims by creditor victims of Prime Capital Ventures, LLC,<br><br>Plaintiff,<br><br>-against-<br><br>INDIGO PHARMACEUTICAL, LLC, DRAWBRIDGE CAPITAL LLC, DR. MURRAY FRIEDMAN, and JOHN OR JANE DOES 1 TO 10,<br><br>Defendants. | Adv. Pro. No. 26-________ |

**COMPLAINT SEEKING (I) THE AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(a), 548(a)(1)(A) AND (B), AND N.Y. DCL §§ 273, 274, 276 AND 276-a, (II) THE RECOVERY OF AVOIDABLE TRANSFERS FROM ALL INITIAL, IMMEDIATE OR MEDIATE TRANSFEREES, OR BENEFICIARIES OF SUCH TRANSFERS, PURSUANT TO 11 U.S.C. § 550(a); (III) DAMAGES FROM UNJUST ENRICHMENT; (IV) DAMAGES FOR AIDING AND ABETTING FRAUD; AND (V) PAYMENT OF PRE-JUDGMENT INTEREST AND ATTORNEYS' FEES**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................1

JURISDICTION AND VENUE ....................4

BASIS FOR RELIEF ....................4

PARTIES ....................5

FACTS COMMON TO ALL CAUSES OF ACTION ....................6

A. The Players ....................6

B. The Ponzi Scheme ....................9

i. The Fraud Concept ....................9

ii. The Origin of the Fraud ....................13

iii. The Proliferation of the Fraud ....................16

iv. The Collapse ....................17

C. The Bankruptcy Cases and Federal Equity Receivership ....................19

D. The Ponzi Finding ....................24

E. The Criminal Convictions of Roglieri, Humphrey, and Snyder, and Related Forfeiture ....................24

i. Roglieri – Criminal and Civil Forfeiture Cases ....................24

ii. Humphrey – Criminal Case ....................27

iii. Snyder – Criminal Case ....................27

F. Prime Capital's Line of Credit to Indigo ....................28

i. The Agreements and Transfers ....................28

ii. Aiding and Abetting the Fraud ....................33

iii. Indigo Appears to be Defunct ....................45

FIRST CAUSE OF ACTION ....................46

SECOND CAUSE OF ACTION ....................47

THIRD CAUSE OF ACTION ....................48

FOURTH CAUSE OF ACTION ....................49

FIFTH CAUSE OF ACTION ....................50

SIXTH CAUSE OF ACTION ....................51

SEVENTH CAUSE OF ACTION ....................54

Fred Stevens (the "Plan Administrator" or "Plaintiff"), in his capacity as the Plan Administrator for Prime Capital Ventures, LLC, the above-captioned debtor ("Prime Capital" or the "Debtor"), by and through his counsel, Klestadt Winters Jureller Southard & Stevens, LLP, as and for his complaint (the "Complaint") herein against Indigo Pharmaceutical, LLC ("Indigo"), Drawbridge Capital LLC ("Drawbridge"), Dr. Murray Friedman ("Dr. Friedman"), and John and Jane Does 1 to 10 who are as of yet unidentified (collectively, the "Defendants," each a "Defendant"), seeking, among other things, (I) the avoidance of fraudulent transfers pursuant to 11 U.S.C. §§ 544(a), 548(a)(1)(A) and (B), and N.Y. Debtor and Creditor Law §§ 273, 274, 276, and 276-a, (II) the recovery of avoidable transfers from all initial, immediate, or mediate transferees, or beneficiaries of such transfers, pursuant to 11 U.S.C. § 550(a), (III) the disgorgement of any sums by which the Defendants have been unjustly enriched, (IV) damages from Dr. Friedman for aiding and abetting Prime Capital's fraud, and (V) payment of all pre-judgment interest and attorneys' fees; alleges as follows:

## PRELIMINARY STATEMENT

Prime Capital was an advance-pay lending and Ponzi scheme created and operated by its principal, Kris Roglieri ("Roglieri"), and his co-conspirator, Kimberly Humphrey ("Humphrey"). Roglieri and Humphrey defrauded dozens of prospective borrowers out of well over $100 million based upon the false premise that Prime Capital had the present ability to fund large commercial loans to the victims. Prime Capital told the victims that the deposits were a precondition to Prime Capital funding the loans. In truth, Prime Capital had no ability to fund any loans as its only source of funds was the deposits obtained from new victims. Predictably, Prime Capital's fraud only lasted two short years from December 2021 to December 2023 before imploding under the weight of lawsuits brought by victims throughout the country seeking the return of their deposits and other

damages.

Prime Capital took in at least $179 million in victim deposits and it used the proceeds of its fraud to: (i) purchase over $25 million in automobiles, jewelry, and other luxury items, for Roglieri and Humphrey; (ii) purchase a $4 million luxury property in Virginia Beach for Humphrey's use; (iii) prop up unrelated business ventures with over $10 million in cash transfers; (iv) make a $20 million highly speculative investment which itself turned out to be a fraud on Prime Capital; and (v) return deposits or make advances under the loans totaling approximately $109 million using the deposits from new victims in order to avoid the fraud from being discovered. Roglieri, Humphrey, and Humphrey's brother, Chris Snyder, have all been convicted of wire fraud charges and/or other crimes in connection with their operation of the Prime Capital Ponzi scheme.

Each and every transfer made by Prime Capital was in furtherance of its fraud and done with actual intent to hinder, delay, and defraud present and future creditor victims. Accordingly, the Plan Administrator is seeking the recovery of transfers made by Prime Capital including those to the Defendants so that recoveries can be distributed to Prime Capital's creditor victims equally.

In the instant case, Indigo was one of the fortunate three parties who had their loans advanced by Prime Capital at least in part in the collective amount of $19,247,500.00 in the transfers as identified on Exhibit A (collectively, the "Transfers"). Like all transfers made by Prime Capital, the Transfers were made in furtherance of Prime Capital's fraud in order to keep the fraud from being discovered. Prime Capital made the Transfers only after significant threats and pressure from Indigo.

Indigo is not an innocent victim of Prime Capital's Ponzi scheme that just so happened to have been one of the few parties to have its loan funded. Indigo's loan was funded only because

it agreed to assist Prime Capital in attracting new victims. Indigo agreed to and did make a lengthy video advertisement for Prime Capital that was published on YouTube and used by Prime Capital to dupe new victims of its Ponzi scheme. In that video, Dr. Friedman made numerous false statements and characterizations regarding Prime Capital, its business, and Roglieri. Dr. Friedman falsely claimed in that video that "[t]his [Prime Capital] is a fantastic resource for anybody that wants to finance their business in my opinion", that Indigo "got our funding in the manner that was promised in the contract", and that "[e]verything came through with flying colors". Dr. Friedman added that "we were very happy with it and we love our relationship with Prime Capital Ventures and we have our financing". Dr. Friedman even went on to "thank Kris [Roglieri] for creating this program".

A prospective victim of Prime Capital watching that video would assume that Prime Capital was a reputable and reliable lender just with a unique lending model. Nothing could be further from the truth and Dr. Friedman knew it. Dr. Friedman intentionally concealed the significant issues that he and Indigo had with Prime Capital and made it sound like the transaction was smooth and above board in order to ensure that Prime Capital continued to fund the loan. Indeed, Dr. Friedman had to fight for every penny of funding from Prime Capital and at the time the video was published, Prime still had not completely funded the loan and in fact, the loan was never completely funded. Unfortunately, the video worked. Using that video and others, Prime Capital was able to attract new victims and use some of their funds to transfer to Indigo. Dr. Friedman even agreed to talk to prospective victim creditors of Prime Capital at Prime Capital's request as a borrower reference. Indigo's and specifically Dr. Friedman's conduct in this regard aided and abetted Prime Capital in the continued perpetration of its fraudulent scheme to the significant detriment of victims.

Accordingly, the Plan Administrator seeks recovery of the Transfers as fraudulent transfers together with interest and costs. In addition, the Plan Administrator, as assignee of the claims of numerous victims of Prime Capital's fraudulent scheme, seeks damages from Indigo and Dr. Friedman in connection with their aiding and abetting Prime Capital's scheme in an amount to be determined at trial.

**JURISDICTION AND VENUE**

1. This adversary proceeding relates to the chapter 11 bankruptcy case captioned *In re Prime Capital Ventures, LLC*, Case No. 24-11029 (PGR), pending in the United States Bankruptcy Court for the Northern District of New York before the Honorable Patrick G. Radel, United States Bankruptcy Judge (the "Bankruptcy Court").

2. The Bankruptcy Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§ 157(a) and (b) and 1334(b), and Rule 81.1 of the Local Rules for the United States District Court for the Northern District of New York referring matters arising under Title 11 of the United States Code (the "Bankruptcy Code") to the Bankruptcy Court.

3. The Plan Administrator consents to the entry of final orders or judgments by the Bankruptcy Court with respect to all matters and claims raised by this Complaint.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code.

**BASIS FOR RELIEF**

5. This adversary proceeding is brought pursuant to sections 544(a), 548(a)(1)(A) and (B), and 550(a)(1) of the Bankruptcy Code, sections 273, 274, 276 and 276-a of the New York Debtor and Creditor Law ("NY DCL") and the common law theories of unjust enrichment and aiding and abetting fraud.

## PARTIES

6. Pursuant to the terms of that certain *Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") [Docket No. 369-1][1] confirmed by Order of the Bankruptcy Court dated February 11, 2026 [Docket No. 401], the Plan Administrator and his predecessor were appointed and granted the standing, power, and authority to assert the claims in this Complaint. The Plan Administrator maintains offices at c/o Klestadt Winters Jureller Southard & Stevens, LLP, 286 Madison Avenue, 11th Floor, New York, New York 10017. In addition, the Plan Administrator has been assigned certain claims of creditor victims of Prime Capital's Ponzi scheme and asserts certain claims in that capacity.

7. Prime Capital is a limited liability company organized under the laws of the state of Delaware. While it was operating, Prime Capital's principal place of business was 66 South Pearl Street, Albany, New York 12207. Prime Capital's bankruptcy estate is now under the control of the Plan Administrator and overseen by its Oversight Board comprised of Compass-Charlotte 1031, LLC, 526 Murfreesboro, LLC, Piper Capital Funding, LLC, and ER Tennessee LLC.

8. Roglieri is an individual who is currently residing at the Danbury Federal Correctional Facility, 33 ½ Pembroke Station, Route 37, Danbury, Connecticut 06811. Roglieri was the sole owner of Prime Capital's membership interests.

9. Humphrey is an individual who is, upon information and belief, currently residing at 506 Cavalier Drive, Virginia Beach, Virginia 23451. Humphrey is awaiting sentencing and potential incarceration. Humphrey was the Executive Vice President of Prime Capital.

10. Indigo Pharmaceutical, LLC is a limited liability company organized under the laws

---

[1] Any citation to "Docket No." contained herein shall refer to the docket entries within the bankruptcy case fashioned *In re Prime Capital Ventures, LLC*, Case No. 24-11029 (PGR) before the United States Bankruptcy Court for the Northern District of New York.

of the state of Nevada. Indigo maintains an address for service of process at c/o Cogency Global Inc., 321 W. Winnie Lane #104, Carson City, Nevada 89703. Indigo also maintains offices or previously maintained offices at 270 S. Martin Luther King Boulevard, Las Vegas, Nevada 89106.

11. Drawbridge Capital LLC is a limited liability company organized under the laws of the state of Illinois. Drawbridge maintains an address for service of process at c/o Bliss McMahon, 8735 W. Higgins Road, Suite 150, Chicago, Illinois 60631-2739. Drawbridge also maintains offices at 8750 W Bryn Mawr Avenue, Suite 300, Chicago, Illinois 60631.

12. Dr. Murray Friedman is an individual and maintains a residence at 750 Broadway, Woodmere, New York 11598.

13. John or Jane Does 1 to 10 are currently unidentified defendants who may later be discovered to have received or benefitted from the Transfers from Prime Capital.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A. The Players

14. Roglieri is an Albany-area entrepreneur and commercial finance executive who was actively involved in the commercial lending and finance training sectors.

15. Prior to the formation of Prime Capital, Roglieri created, owned, and managed several other businesses.

16. On or around July 26, 2006, Prime Commercial Lending, LLC ("Prime Commercial") was formed by Roglieri as a New York limited liability company. Prime Commercial was a small lender that made loans as small as $22,000 to businesses and up to $2 million on commercial real estate.

17. Other businesses created and operated by Roglieri include Commercial Capital Training Group ("CCTG"), a training organization for commercial finance brokers, and The

Finance Marketing Group, a marketing company serving financial services businesses.

18. Roglieri also maintained certain entities associated with his collecting and showing exotic luxury sports cars including Shark Ventures LLC and FUPME, LLC.

19. Prior to his arrest in May 2024, Roglieri maintained a larger-than-life persona. Among other things, Roglieri wore flashy clothes, collected luxury wristwatches, smoked expensive cigars, and maintained a large fleet of luxury sportscars that he would show with the team name and Instagram handle "@teamloansharks" often emblazoned with the moniker "F—K YOU…PAY ME". Pictured here is Roglieri from his now removed Instagram page, smoking a cigar while leaning against a sportscar after being pulled over by the police, in his garage amongst some of his cars, partying in Las Vegas with his girlfriend, on a private jet (actually posted from @postureupson with @teamloansharks tagged), and gambling at the Casino de Monte-Carlo, and partying with three friends on a yacht in the French Riviera from a video taken in October 2023 while Prime Capital was imploding:
















20. Roglieri was by all counts very successful in his prior ventures and already lived an opulent lifestyle long before starting Prime Capital in December 2021.

21. Humphrey is a lifelong resident of Virginia Beach, Virginia. Roglieri met Humphrey in or around the late 2010's when she allegedly purchased and took a commercial loan broker training course from Roglieri's CCTG along with her brother, Chris Snyder ("Snyder").

22. In 2020, CCTG published an hourlong podcast interview of Humphrey by Roglieri where the two talk at length about her history, their professional relationship, and the commercial loan business:[2]

[2] See Commercial Capital Training Group, LLC, Entrepreneurs in Finance | Episode 7 | Kimmy Humphrey [Video], August 24, 2022, https://www.youtube.com/watch?v=aL3qXCAYP-M&t=1437s (YouTube) at 11:36.




23. According to Humphrey's LinkedIn page, she sourced "the Debt and Equity for Deals $100MM+", and started as an Executive Vice President of Prime Commercial in or around November 2019.[3]

24. Upon information and belief based upon Humphrey's statements on the CCTG podcast, Snyder was partners with Humphrey in their lending enterprise, Capital Atlantic Solutions, which operated at or around the same time that Humphrey was also working for Prime Commercial.

**B. The Ponzi Scheme**

***(i) The Fraud Concept***

25. Prime Capital was formed on December 14, 2021, and purported to be a legitimate alternative (or nonbank) commercial lender. Prime Capital advertised proudly that:

---

[3] See Kimberly H, *LinkedIn*, https://www.linkedin.com/in/kimberly-h-351800198/ (last visited July 22, 2026).




*See* Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:21.

26. Generally, alternative lenders offer borrowers some significant benefits over traditional bank lenders by having simpler application processes, fewer underwriting requirements, different and more flexible financing products, and more rapid funding.[4] Roglieri confirmed that this was Prime Capital's business model claiming that he "saw a rising demand from borrowers who needed to move projects forward with as little static as possible" and that Prime Capital could "provide solutions that are less restrictive than your average bank and offer generous terms that favor borrowers."[5] The disadvantage of going to an alternative lender is that they typically charge higher interest rates than what may be available at a traditional bank.[6] Prime Capital on the other hand offered all of the advantages of an alternative lender, while offering interest rates well below market.

27. On May 2, 2022, Prime Capital described its business in an article in DealMaker Magazine, a publication that Roglieri purportedly owned or started, as "a fund specifically

---

[4] See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, kapitus.com, https://kapitus.com/blog/manage-your-money/financing/traditional-bank-vs-alternative-lender-which-is-better-for-your-small-business-kapitus/.

[5] Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release] https://www.prnewswire.com/news-releases/albany-new-yorks-prime-commercial-lending-funds-the-first-5-star-hotel-in-atlanta-ga-through-primes-real-estate-fund-prime-capital-ventures-301505069.html.

[6] See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, *supra*.

designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[7] Prime Capital offered non-recourse loans with interest rates of 4 to 6% with interest only payments.[8] At the exact same time, interest rates were rising rapidly in response to inflationary pressure. At the time of Prime Capital's advertisement (May 2022), the prime interest rate was 4%, rising to 4.75% a month later, then to 6.25% by September 21, 2022, and peaking at 8.5% on July 26, 2023.[9] 15-year mortgages followed the same trend starting at 4.52% on May 5, 2022 and peaking at 7.03% on October 26, 2023.[10]

28. In order to be a successful lender, Prime Capital would have had the impossible task of obtaining capital at well below the 4 to 6% that it was offering to its prospective borrowers. In truth, Prime Capital had no known legitimate source of capital to lend to prospective borrowers. Instead, it obtained its capital by converting its prospective borrowers' own funds.

29. Prime Capital required as a condition of providing a loan that its prospective borrower provide 20% of the contemplated loan as an upfront deposit (defined as an "ICA Deposit," or collectively, the "ICA Deposits"). Roglieri stated that borrowers "have to come to the table with at least 20% and that's just an important function of how our product works."[11] Prime Capital claimed that it would hold the ICA Deposit "as prepaid interest throughout the term of the loan."[12] As interest payments became due, Prime Capital represented that it "would just

---

[7] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund.
[8] See Id.
[9] See https://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm.
[10] See Freddie Mac https://www.freddiemac.com/pmms.
[11] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com.
[12] See Id.

deduct it from the [ICA DEPOSIT]".[13] Prime Capital admitted that this was "a unique way of doing things" but claimed that it "ensures [Prime Capital's] payback, and [the ICA Deposit] serves as additional collateral for the loan throughout the term."[14]

30. In an email dated April 27, 2023, Humphrey responded as follows to a prospective client's question about whether Prime Capital could transfer an ICA Deposit without a client's permission:

> When we pull through the hf [hedge fund], it [the ICA Deposit] gets locked by RBC [Royal Bank of Canada], Goldman [Sachs] or Interactive [Brokers] themselves. And it doesn't get unlocked until the line is completely paid back. In other words, if the ICA is $10m and the facility is $50m- RBC locks the 10m at the time they make the 50m facility available. It doesn't leave the account but we can't do anything with if bc [because] they collateralized it. Once we pay the 50m back they unlock the 10m.[15]

31. As Roglieri explained to a borrower client during a recorded Zoom call in December 2023:

> So with our process, we usually require anywhere from 20 to 30 percent down on, based on the total capital stack. . . We call that the essentially the ICA, it's an Interest Credit Account. We require that down payment in the form of cash to us because we view it as, it really performs three functions for us . . . number one, the ICA is considered essentially additional collateral for the loan throughout the term. Number two, it acts as pre-paid interest reserves, so theoretically our client never has to make a payment for us, payment to us on a quarterly or monthly basis when that money gets deposited in an account that we control in our name. The client . . . would get a statement every month or every quarter showing how much was drawn down and the interest that is due on that and that is essentially how we get paid back through that ICA account through the term. . . . There really isn't any risk. The [ICA] money gets put into a pledged account.[16]

32. All of Prime Capital's representations regarding the ICA Deposits and Prime Capital's ability to fund loans were false. ICA Deposits were not deposited into pledged accounts

---

[13] Id.
[14] Id.
[15] See USA v. Humphrey, Case No. 25-cr-00238, Docket No. 4, ¶5(d) (N.D.N.Y. June 10, 2025).
[16] See USA v. Roglieri, Case No. 24-cr-00392, Docket No. 90, ¶5(e) (N.D.N.Y. Nov. 13, 2025).

and Prime Capital had no ability to fund loans. In fact, Prime Capital's only source of capital was from obtaining ICA Deposits from victims, and many ICA Deposits were consumed immediately upon receipt by Prime Capital.

33. The ICA Deposits were an investment by the borrower victims to get access to Prime Capital's promise of cheap and readily available capital. A loan from Prime Capital would theoretically allow a prospective borrower to invest in its underlying business and hopefully make big returns. Prime Capital's prospective borrowers did not appear to have other viable sources of capital, or at least not any as inexpensive as what Prime Capital was offering. Prime Capital further enticed prospective borrowers with what appear to have been very little underwriting and collateral requirements. Prime Capital also did not require personal guarantees or recourse on the loans.

***(ii) The Origin of the Fraud***

34. In order to sell a business model that seemed entirely impossible if properly understood, and to get prospective borrowers to give Prime Capital new ICA Payments, Prime Capital had to demonstrate that it actually made loans. It did this by, among other ways, fraudulently claiming to have made a "$188,000,000 funding of ALUX Properties, LLC and their project 'The Bailey' which will be the only 5-star hotel in Atlanta".[17]

---

[17] See Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:13:




See also, Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release].

35. Prime Capital made a glitzy promotional video published on YouTube in May 2022 where it boasted about making this loan. The video featured Roglieri and others traipsing around the wooded area in Atlanta where "The Bailey" was going to be constructed. The alleged principal of ALUX Properties, LLC ("ALUX"), Brandon Wheeless, expressed his appreciation in the video stating that "access to this type of capital with trusted individuals that you close deals with definitely makes life a heck of a lot easier for us and the company so we are fast-tracking to grow at an exponential rate moving forward."[18] Depicted here are Messrs. Wheeless and Roglieri surveying the site, along with the "after" rendering of "The Bailey" contained in Prime Capital's video advertisement[19]:






36. In reality, Prime Capital never made any such loan to ALUX. There is no "The Bailey" hotel in Atlanta. According to Prime Capital's books and records, Brandon Wheeless, the purported principal of ALUX and third-party borrower of Prime Capital, was actually on Prime Capital's payroll and received a total of $200,000 from Prime Capital in $10,000 monthly payments between July 7, 2022 and September 18, 2023.

37. ALUX, the purported borrower, was placed into a receivership by the Georgia Superior Court on September 13, 2022 in connection with a lawsuit where the plaintiffs alleged,

---

[18] See Id. at 3:44 (transcribed by counsel).
[19] See Id. at 2:58 and 1:35, respectively.

among other things, to have been defrauded out of $10 million.[20] Featured in that litigation was an entity called Blackwater Capital Group, LLC ("Blackwater") which purported to act as a lender to the project, not unlike Prime Capital in its promotional video.[21] Blackwater's lending agreement was dated December 14, 2021, the exact date that Prime Capital was formed, and was nearly identical in form and substance to the form of lending agreement employed by Prime Capital.[22] Compared here are the first pages of the table of contents of Blackwater's December 14, 2021 lending agreement (on the left), and Prime Capital's April 24, 2023 lending agreement with creditor Compass-Charlotte (on the right)[23]:



Case 1:24-cv-00055-MAD-PJE Document 1-21 Filed 01/12/24 Page 92 of 302

DocuSign Envelope ID: 0CAFC338-732D-4304-B32B-FA350CA8AA9E

TABLE OF CONTENTS


| | Page |
|---|---|
| RECITALS | 1 |
| ARTICLE 1 DEFINITIONS | |
| Section 1.1. Certain Defined Terms | 2 |
| ARTICLE 2 THE CREDIT | |
| Section 2.1. Line of Credit Amount | 4 |
| Section 2.2. Line of Credit Documents | 4 |
| ARTICLE 3 TERM, INTEREST AND PAYMENTS | |
| Section 3.1. Initial Term | 5 |
| Section 3.2. Extended Term | 5 |
| Section 3.3. Applicable Interest Period | 5 |
| Section 3.4. Interest Rate Calculation | 5 |
| Section 3.5. Interest Payments | 6 |
| Section 3.6. Reserves | 6 |
| Section 3.7. Risk Management Protection for ICA Payment | 6 |
| Section 3.8 Prepayment | 6 |
| Section 3.9. Interest Credit Account | 6 |
| Section 3.10. Fees | 7 |
| Section 3.11. Line of Credit Extension Fees | 7 |
| Section 3.12. Legal and Incidental Fees, Charges and Costs | 7 |
| Section 3.13. Line of Credit Disbursement Account | 7 |
| Section 3.14. Taxes | 8 |
| ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT | |
| Section 4.1. Delivery of the LOC Documents | 8 |
| Section 4.2. Authority | 8 |
| Section 4.3. Liens | 9 |
| Section 4.4. Litigation | 9 |
| Section 4.5. Events of Default | 9 |
| Section 4.6. Purchase and Agreement Contracts | 9 |
| Section 4.7. Compliance with Certain Requirements | 9 |
| Section 4.8. Evidence of Insurance | 9 |
| Section 4.9. Financial Statements | 10 |
| Section 4.10. Business Pro Forma | 10 |
| Section 4.11. Management Plan | 10 |
| Section 4.12. Material Change | 10 |
| Section 4.13. Non-Subordination | 10 |
| Section 4.14. Borrower JV Governing Agreement | 10 |
| Section 4.15. Securitization | 11 |
| ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS | |
| Section 5.1. Development Costs | 11 |


Revised 3/17/21



DocuSign Envelope ID: C6803AD2-C692-4520-AAB9-59C5808496A6 Case 1:24-cv-00055-MAD-PJE Document 1-29 Filed 01/12/24 Page 3 of 61

TABLE OF CONTENTS


| | Page |
|---|---|
| RECITALS | 1 |
| ARTICLE 1 DEFINITIONS | |
| Section 1.1. Certain Defined Terms | 2 |
| ARTICLE 2 THE CREDIT | |
| Section 2.1. Line of Credit Amount | 4 |
| Section 2.2. Line of Credit Documents | 4 |
| ARTICLE 3 TERM, INTEREST AND PAYMENTS | |
| Section 3.1. Initial Term | 5 |
| Section 3.2. Extended Term | 5 |
| Section 3.3. Applicable Interest Period | 5 |
| Section 3.4. Interest Rate Calculation | 5 |
| Section 3.5. Interest Payments | 6 |
| Section 3.6. Reserves | 6 |
| Section 3.7. Intentionally Omitted | 6 |
| Section 3.8. Prepayment | 6 |
| Section 3.9. Interest Credit Account | 6 |
| Section 3.10. LOC Fee | 7 |
| Section 3.11. Line of Credit Extension Fees | 7 |
| Section 3.12. Legal and Incidental Fees, Charges and Costs | 7 |
| Section 3.13. Taxes | 8 |
| ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT | |
| Section 4.1. Delivery of the LOC Documents | 8 |
| Section 4.2. Authority | 8 |
| Section 4.3. Liens | 9 |
| Section 4.4. Litigation | 9 |
| Section 4.5. Events of Default | 9 |
| Section 4.6. Purchase and Agreement Contracts | 9 |
| Section 4.7. Compliance with Certain Requirements | 9 |
| Section 4.8. Evidence of Insurance | 9 |
| Section 4.9. Financial Statements | 10 |
| Section 4.10. Business Pro Forma | 10 |
| Section 4.11. Management Plan | 10 |
| Section 4.12. Material Change | 10 |
| Section 4.13. Non-Subordination | 10 |
| Section 4.14. Borrower Governing Agreement(s) | 10 |
| Section 4.15. Securitization | 11 |
| ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS | |
| Section 5.1. Development Costs | 11 |


[20] See Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al., Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 22, 2024).
[21] See Id., Judgment entered June 24, 2023.
[22] See Id., Verified Complaint, Exhibit E, executed June 9, 2022.
[23] See Id., compared to Exhibit 29 to the Complaint filed in Compass-Charlotte v. Prime Capital Ventures, LLC, et al., Case No. 24-cv-55 (MAD) (N.D.N.Y. Jan. 12, 2024).

38. Upon information and belief, Roglieri and Humphrey met Blackwater and ALUX in connection with trying to arrange the funding for ALUX's ICA Deposit to Blackwater through Prime Commercial. That is where they learned of the concept and decided to form Prime Capital to copy the fraudulent concept apparently devised by Blackwater.

***(iii) The Proliferation of the Fraud***

39. Roglieri and Humphrey saw "success" almost immediately with the Prime Capital fraud. ICA Deposits on loans that Prime Capital had absolutely no ability to fund started flowing in at a rapid rate.

40. Prime Capital took several steps to advertise and proliferate its fraud. Among other things, it:

a. advertised heavily on YouTube by boasting about loans that never existed including the alleged $188 million to ALUX to build "The Bailey", that it "gained prominence by committing $17 billion with a South Korean firm for projects in the United States and abroad,"[24] and that it had provided "$2.3 billion in funding for the first stage of a massive five-year, five-stage $22 billion project" "[i]n the heart of Dubai";[25]

---

[24] See Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release]; see also Prime Commercial Lending, Prime Commercial Lending Commits to Lending $17 Billion [Video], Jan. 21, 2022, https://www.youtube.com/watch?v=PmvtmdkBUlo (YouTube) at 0:13:




[25] Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund.

b. used large law firms like Sheppard, Mullin, Richter & Hampton LLP, to represent it in its loan transactions to add legitimacy to its business model, and even featured Ned Trombly, a partner of Barclay Damon LLP, as its "Lead Counsel" on its website; and

c. in the few loans that it funded in whole or in part, it got the borrowers to participate in video advertisements designed to attract new victims to the fraud.[26]

41. Prime Capital got its first ICA Deposit for Indigo on June 3, 2022 and July 22, 2022 in the amounts of $1 million and $2 million, respectively. From there, the ICA Deposits started to flow – (i) on July 18, 2022 Prime Capital received a $1.4 million ICA Deposit for Norwell Ventures, LLC, (ii) on September 21, 2022 and September 22, 2022 Prime Capital received a $20 million ICA Deposit for Onward Partners, LLC and (iii) on October 13, 2022, Prime Capital received a $3 million ICA Deposit for Lake's Edge Development Group, LLC.

42. In total, Prime Capital took in approximately $179 million in ICA Deposits, of which approximately $109 million were returned to borrowers or advanced under the respective line of credit agreement and approximately $70 million was consumed by Roglieri, Humphrey, and Snyder, leaving no less than 16 victims left holding the bag with claims totaling over $100 million.

***(iv) The Collapse***

43. Having no legitimate source of capital to fund loans, Prime Capital's collapse was inevitable.

44. Near the beginning, Humphrey expressed some concern over the inability to fund

[26] See Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV [Video], April 20, 2023, https://www.youtube.com/watch?v=GvmECqnuBkY&t=326s (YouTube); and Prime Commercial Lending, Prime Capital Ventures Presents Home Rentals in Carbondale, IL [Video], March 3, 2023, https://www.youtube.com/watch?v=8D5GRnKecG0.

promised loans but was quickly shut down by Roglieri. For example, in June 2022, Prime Capital accepted a $1 million ICA Deposit from Indigo even though it had no ability to fund the $20 million loan that Indigo was seeking. On July 8, 2022, Humphrey sent an email to Roglieri titled "Do not sign docs for pharmacy," in which she wrote, "You have no way to get them funded in 60 days now. You never ducking listen. Should have never taken in the money. But we're down to 60 days so do not sign the docs." Roglieri responded "Get yourself under control. NOW." Roglieri signed the documents and Humphrey continued to participate actively in Prime Capital's fraud from that time until its collapse.

45. Once prospective borrowers realized that they were not getting their loans funded, they began demanding the return of the ICA Deposits. However, Prime Capital had squandered tens of millions of dollars in the ICA Deposits for the benefit of Roglieri, Humphrey, and Snyder, on speculative investments, propping up Roglieri's other businesses, and to purchase million-dollar vehicles, luxury watches and jewelry, domestic and international travel by private jet, and a home in Virginia Beach for Humphrey's use. Thus, when prospective borrowers demanded the return of their ICA Deposits, Prime Capital was unable to meet the demand unless it could obtain new ICA Deposits from additional victims.

46. By the end of 2023, Prime Capital was besieged by litigation brought by its victims leading to its final collapse.[27] Text messages between Humphrey and Snyder revealed Prime Capital's desperation to keep defrauding new victims. For example, on April 9, 2023, the two had

---

[27] See, e.g., Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and subsequently obtained the return of $13.4 million); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4.3 million); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million); Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $12.4 million); The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); Onward Holding, LLC, v. Prime Capital, et al., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking return of $4 million).

the following text exchange:

| Sender | Message |
|---|---|
| Humphrey | Fuck |
| | 350 is not coming |
| Snyder | At all?? |
| | Shit |
| | Why? |
| Humphrey | Bc [a borrower]'s investor wants to look over all docs |
| | And said it will take a couple days |
| | We need it for [a different borrower] today |

and on September 19, 2023, the two corresponded as follows:

| Sender | Message |
|---|---|
| Humphrey | If we don't get a closing in today |
| | It's over |
| | Nothing we can do anymore |
| Snyder | We gotta start selling some stuff off so we can pay our bills. I need cash. |
| | Is there any point in having the csll [call] w [a prospective borrower] today then? He won't be able to wire today |
| Humphrey | Doubtful |
| | It killed us when, no LOIs [letters of intent] or closings happened |
| | Everyone requested ICA and dds [due diligence fees] back |
| | And we can't come back from it |
| | There are [law]suits all over |
| | Kris threw in the towel |

See USA v. Humphrey, Case No. 25-cr-00238, Dkt. No. 4, ¶5(i) (N.D.N.Y. June 10, 2025).

47. Even after those damning text exchanges, Prime Capital continued to solicit, take in, and rapidly consume ICA Deposits including those from 1322 Developments, LLC, by its lender ER Tennessee, in September 2023 in the amount of $14,249,832, and 1800 Park Avenue LLC in December 2023 in the amount of $5 million.

**C. The Bankruptcy Cases and Federal Equity Receivership**

48. On December 19, 2023, Compass-Charlotte 1031, LLC ("Compass-Charlotte"), 526 Murfreesboro, LLC ("526 Murfreesboro"), and Newlight Technologies, Inc. (Newlight, and

together with Compass-Charlotte and 526 Murfreesboro, the "Petitioning Creditors") filed an involuntary petition against Prime Capital for relief under chapter 7 of the Bankruptcy Code commencing Case No. 23-11302 ("Case 1"). The Petitioning Creditors commenced Case 1 for the obvious purpose of ensuring that Prime Capital's fraud would stop and its assets and liabilities could be liquidated in a single, public forum, and that no single creditor could win the proverbial "race to the courthouse".

49. On December 22, 2023, upon order of the Bankruptcy Court, the United States Trustee (the "U.S. Trustee") appointed Christian H. Dribusch ("Dribusch") as the interim chapter 7 trustee of Prime Capital's estate.

50. Rather than submit to the orderly winddown or restructuring of Prime Capital's business in Case 1, Roglieri pushed Prime Capital in an entirely different direction. Roglieri caused Prime Capital to contest the involuntary petition on the basis that at least two of the Petitioning Creditors' claims were allegedly subject to a bona fide dispute because litigation concerning their claims was pending. See Debtor's Motion for Judgment Dismissing the Petition, Case 1 Docket No. 72, p.1.

51. Roglieri funded fighting Case 1 by defrauding a final victim. Beginning in or around October 2023, 1800 Park Avenue LLC ("1800 Park") was negotiating a contemplated $105 million loan from Prime Capital under Prime Capital's standard model, pursuant to which Prime Capital issued a "Terms and Contingent Letter of Intent" that was executed by 1800 Park on October 25, 2023. The term sheet contemplated an ICA Deposit of $26,277,562.

52. On December 12, 2023, Prime Capital issued a "Commitment to Fund Letter" to 1800 Park for a line of credit in the amount of $98,905,467, which was executed by both Roglieri and Jeffrey Huston of 1800 Park.

53. On December 18, 2023, one day before the commencement of Case 1, 1800 Park received draft loan documents that for the first time that included Prime Commercial as the lender instead of Prime Capital.

54. Three (3) days after the commencement of Case 1, on December 22, 2023, 1800 Park entered into a deposit agreement with Prime Commercial, pursuant to which 1800 Park agreed to make an initial ICA Deposit of $5,000,000 in connection with a contemplated loan from Prime Commercial (the "1800 Park Deposit"). Contemporaneously, 1800 Park made the 1800 Park Deposit which was received into Prime Capital's Key Bank Account No. ****2233 due to Roglieri and Humphrey's failure to change the account number from Prime Capital's to Prime Commercial's. 1800 Park was completely unaware of the commencement of Case 1 against Prime Capital.

55. Immediately upon receipt of the 1800 Park Deposit on December 22, 2023, Prime Capital transferred the 1800 Park Deposit to Prime Commercial's Key Bank Account No. ****4465.

56. Roglieri and Humphrey used the 1800 Park Deposit for, among other things, the following purposes: (i) funding a $50,000 retainer to Cullen and Dykman LLP, and a $400,000 retainer to Hogan Lovels US LLP, to fight the Petitioning Creditors in Case 1; (ii) funding a $100,000 retainer to Pashman Stein to represent Roglieri personally in his bankruptcy proceeding; (iii) funding an additional $950,000 to Caruso Home Builders under an existing loan; (iv) paying $434,429.47 to Ai Design on account of a custom car buildout for Roglieri; (v) transferring $526,000 to CCTG; (vi) paying $84,000 to Wrist Aficionado for a wristwatch for Roglieri; and (vii) transferring $2,000,000 to CPH LLC, which is believed to be an entity owned by an affiliate of Humphrey.

57. On January 8, 2024, the Petitioning Creditors filed their own motion to dismiss Case 1 [Case 1 Docket No. 74], which motion was granted by the Court on January 9, 2024 [Case 1 Docket No. 87]. Thereafter, Dribusch was discharged from his duties as chapter 7 trustee.

58. Three days after dismissal of Case 1, on January 12, 2024, Petitioning Creditor Compass-Charlotte commenced an action in the United States District Court for the Northern District of New York (the "District Court") under Case No. 24-cv-00055 (MAD) (CFH) (N.D.N.Y. Jan. 12, 1014) (the "Receivership Case"), seeking, among other things, the appointment of a federal equity receiver to take possession and control of Prime Capital's assets and affairs. That same day, the District Court entered an order appointing Paul Levine as the temporary receiver (the "Receiver") [Receivership Case Docket No. 8].

59. Roglieri directed Prime Capital to file an emergency motion on behalf of Prime Capital to, among other things, dismiss the Receivership Case. [Id. at Docket No. 12-14]. On January 24, 2024, the District Court entered a memorandum decision and order making the Receiver's appointment permanent and defining his powers with respect to Prime Capital and its property and denying Prime Capital's motion to dismiss the case. [Id. at Docket No. 56].

60. On February 15, 2024, Roglieri filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code commencing Case No. 24-10157 (REL) (the "Roglieri Case").

61. On May 14, 2024, Prime Capital, by and through the Receiver, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court commencing Case No. 24-10531 ("Case 2").

62. On May 15, 2024, the Court entered an order converting Roglieri's case to one under chapter 7 of the Bankruptcy Code. Roglieri Case at Docket No. 159. Thereafter, the U.S.

Trustee appointed Dribusch as the interim chapter 7 trustee (the "Roglieri Trustee") [Id. at Docket No. 160].

63. On July 23, 2024, the Court entered a memorandum decision and order dismissing Case 2 finding essentially that the Receiver did not have the authority to file Case 2 on behalf of Prime Capital and that the Roglieri Trustee did not have the ability to waive the defect and ratify the filing *ex post facto* [Id. at Docket No. 85].

64. The Roglieri Trustee, who at the time was in possession and control of all membership interests of Prime Capital by and through the Roglieri bankruptcy estate, exercised the necessary powers and executed the necessary documents to assume control of Prime Capital. On September 16, 2024, the Roglieri Trustee, in his capacity as the authorized agent for Prime Capital, filed a voluntary bankruptcy petition on behalf of Prime Capital for relief under chapter 11 of the Bankruptcy Code.

65. In or around May 23, 2025, the Roglieri Trustee resigned and on May 27, 2025, Marianne T. O'Toole was appointed successor chapter 7 trustee of the Roglieri bankruptcy estate (the "Successor Roglieri Trustee"). On June 3, 2025, the Successor Roglieri Trustee filed a consent to the appointment of a chapter 11 trustee in Prime Capital's case [Docket No. 280]. On June 5, 2025, the Court entered an order directing the U.S. Trustee to appoint a chapter 11 trustee [Docket No. 282], and that same day the U.S. Trustee appointed Yann Geron as the chapter 11 trustee (the "Prime Trustee") of Prime Capital [Docket No. 285], which appointment was confirmed by order of the Court on June 10, 2025 [Docket No. 287].

66. The Prime Trustee served in that capacity until on or around February 25, 2026, when the Plan went effective and the Plan Administrator was appointed.

67. On April 22, 2026, pursuant to Section 5.1 of the Plan Administrator Agreement,

Yann Geron, in his capacity as Plan Administrator, resigned.

68. On April 22, 2026, pursuant to Section 2.3 of the Plan Administrator Agreement, the Oversight Committee appointed Fred Stevens, as successor Plan Administrator, effective immediately as of April 22, 2026 and Fred Stevens agreed to serve as successor Plan Administrator.

**D. The Ponzi Finding**

69. Pursuant to the *Order Confirming the Plan*, dated February 11, 2026 [Docket No. 401], the Bankruptcy Court found for the reasons stated therein that Prime Capital "was an advance pay/Ponzi scheme since its formation". See id., at p.16. That order is now final and unappealable. Accordingly, the Ponzi scheme presumption applies to Prime Capital.

70. Under the Ponzi scheme presumption, transfers made by Prime Capital, the Ponzi scheme operator, are presumed to have been made with actual fraudulent intent. See, e.g., *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 (S.D.N.Y. 2007).

**E. The Criminal Convictions of Roglieri, Humphrey, and Snyder, and Related Forfeiture**

***(i) Roglieri – Criminal and Civil Forfeiture Cases***

71. On May 28, 2024, the United States of America (the "Government") filed a sealed criminal complaint against Kris Roglieri alleging probable cause exists for charging Roglieri with wire fraud committed in violation of 18 U.S.C. § 1343, commencing the case of *United States of America v. Kris Roglieri*, Case No. 24-MJ-261 (CFH) (N.D.N.Y.) (the "USA v. Roglieri").

72. On May 31, 2024, Roglieri was arrested by the Federal Bureau of Investigation, and on June 3, 2024, the District Court ordered Roglieri's detention without bail pending trial in the case [Id. at Docket No. 11].

73. On September 19, 2024, a federal grand jury returned an indictment charging Roglieri with five counts of wire fraud in violation of 18 U.S.C. § 1343.

74. On October 22, 2024, the Government commenced a civil forfeiture case against certain property that it alleged was the proceeds of Prime Capital's principals' criminal activity under the caption *United States of America v. One 2003 Ferrari Enzo AB Version E, et al.*, Case No. 24-cv-1345 (MAD/DJS) (N.D.N.Y.) (the "Civil Forfeiture Case"). The following property was named in the Civil Forfeiture Case through the original and amended complaints much of which was included in the criminal forfeiture claims asserted by the Government in USA v. Roglieri:

a. One 2003 Ferrari Enzo AB Version E, VIN #: ZFFCZ56B000132659;

b. One 2014 Ferrari LaFerrari, VIN #: ZFF76ZHB000203166;

c. One 2022 Mercedes Benz, VIN #: W1NYC8AJXNX445045;

d. One 1982 Mercedes Benz 500SL, VIN #: WDB10704612001675;

e. One 1989 Mercedes Benz 560 SEL, VIN #: WDB1260391A497466;

f. One 2007 Mercedes Benz SLR McLaren, VIN #: WDDAJ76F27M001391;

g. One 1987 Mercedes Benz 560, VIN #: WDB1260451A315331;

h. One 2004 Porsche Carrera, VIN #: WP0ZZZ98Z4L000069;

i. One 2022 Ferrari 812 Competizione, VIN #: ZFF03TLA5N0277054;

j. One 2020 Mercedes Benz GT63C4S, VIN #: WDD7X8KB3LA012445;

k. One 2006 Maserati MC 12 Corse, VIN #: ZAMDF44B000029626;

l. One 2023 Mercedes Benz, VIN #: W1K6X7KB5PA204980;

m. One Ferrari Engine Table;

n. $223,365.00 in U.S. currency seized from Thread Bank Account ending 7554 held

in the name of ABBJ, LLC;

o. $467,810.00 in U.S. currency seized from Thread Bank Account ending 1832 held in the name of Capital Investments US, LLC;

p. Refund in the amount of $72,825.83 in U.S. Currency seized from Ai Design;

q. One Richard Mille RM011 Watch with serial number 2722;

r. One Richard Mille RM 65-01 Watch;

s. One Rolex Watch, Serial Number: Y74R6549;

t. One Rolex Watch, Serial Number: 7P65S042;

u. One Rolex Watch, Serial Number: 0WU66577;

v. One Rolex Watch, Serial Number: 65R11547;

w. One Rolex Watch, Serial Number: 8S927086; and

x. Real property commonly known as 600 Linkhorn Drive, Virginia Beach, VA 23451

(collectively, the "Forfeiture Property").

75. By plea agreement dated November 13, 2025, Roglieri pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and submitted to the forfeiture of all Forfeiture Property plus entry of a money judgment in favor of the Government of $55,484,674.84 (the "Roglieri Plea") [USA v. Roglieri at Docket No. 90].

76. Among other things, Roglieri admitted that Prime Capital never secured a proven, demonstrated or realized source of loan funding, and that he "and his co-conspirators used ICA payments from newer borrower clients to partially fund loans to, and to refund ICA payments to older borrower clients" [Id. at ¶5(g)]. Roglieri further admitted that he "also drew on ICA payments to pay his own personal debts (including money owed to the Internal Revenue Service), enrich himself, and purchase million-dollar vehicles, luxury watches and jewelry, and domestic

and international travel by private jet. . . and to pay Humphrey, Snyder, and [an unidentified] Individual-1" [Id.].

77. On April 3, 2026, Roglieri was sentenced to 97 months in federal prison and is currently serving that sentence.

***(ii) Humphrey – Criminal Case***

78. By plea agreement dated June 10, 2025, filed at or around the same time as the commencement of *United States of America v. Kimberly Humphrey a/k/a Kimberly Owen*, Case No. 25-cr-238 (MAD) (N.D.N.Y.) ("USA v. Humphrey"), Humphrey pled guilty to two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and one count of health care fraud in violation of 18 U.S.C. § 1347, and consented to entry of a judgment directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of Prime Capital under 18 U.S.C. § 3663 or § 3663A (the "Humphrey Plea") [Id. at Docket No. 4].

79. Humphrey is currently awaiting sentencing with a sentencing hearing currently scheduled for October 28, 2026.

***(iii)Snyder – Criminal Case***

80. By plea agreement dated May 16, 2025, filed at or around the same time as the commencement of *United States of America v. Christopher Snyder*, Case No. 25-cr-195 (MAD) (N.D.N.Y.) ("USA v. Snyder"), Snyder pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and consented to entry of a judgment directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of Prime Capital under 18 U.S.C. § 3663 or § 3663A (the "Snyder Plea") [Id. at Docket No. 4].

81. On April 16, 2026, Snyder was sentenced to 15 months in federal prison and is currently serving that sentence.

**F. Prime Capital's Line of Credit to Indigo**

***(i) The Agreements and Transfers***

82. ARX, Accurate RX Specialty Pharmacy Corp. ("ARX") is a company organized under the laws of Nevada with its principal place of business at 85-48 118th Street, Kew Gardens, NY 11415. Dr. Murray Friedman is a Managing Officer of ARX. On its website, ARX states that it is "[c]ombining the traditional art of pharmacy and modern medicine with new technology to solve unique patient problems". *See* https://arxspecialtypharmacy.com/.

83. On or around December 17, 2021, ICON PAC Nevada Pool 3 Nevada, LLC (the "Nevada Landlord") submitted a proposal to ARX for lease space located at 270 S. Martin Luther King Blvd. in Las Vegas, Nevada (the "Nevada Premises"). The Nevada Premises consisted of approximately 21,176 square feet to be used for administrative office and warehouse space for the production and distribution of FDA Supervised pharmaceutical manufacturing products. The lease term set forth in the proposal was for a term of 86 months, to commence on January 1, 2022 and expire on February 28, 2029. On or around December 20, 2021, Dr. Friedman, as CEO of ARX, agreed and accepted the proposal

84. Indigo was formed as a Nevada company on January 21, 2022. On the formation documents filed with the Secretary of State for the State of Nevada, Sima Koegel was listed as the Manager/Managing Member and the letter from the Internal Revenue Service assigning Indigo an employer identification number listed Sima Koegel as the sole member.

85. While Ms. Koegel is listed as the owner of Indigo, her father, Dr. Friedman, appears to have communicated with Prime Capital's management in connection with the funding request.

86. Some combination of ARX, Dr. Friedman, and his daughter, Sima Koegel, created Indigo. Ms. Koegel is the majority owner and CEO of Indigo. Indigo operated its pharmaceutical development and manufacturing facility at the Nevada Premises.

87. On or about May 5, 2022, pursuant to that certain Terms and Contingent Letter of Intent (the "LOI"), ARX was pre-approved for advances via a non-recourse, asset-backed Line of Credit with Prime Capital in the estimated principal amount of $21 million, consisting of a project line of credit in the amount of up to $20 million, a $1 million line of credit fee, and a pre-paid interest credit account of $4 million for a term of 60 months. A $20,000 due diligence fee was due upon execution of the LOI.

88. On May 13, 2022, ARX made a $20,000 payment to Prime Capital on account of the due diligence fee.

89. On or around June 2, 2022, Indigo entered into a Business Expansion Line of Credit Agreement with Prime Capital (the "LOC Agreement"). The LOC Agreement called for $4 million in an interest credit account held by Prime Capital for the benefit of Indigo pursuant to the LOC Agreement (the "Indigo ICA"), up to $20 million in advances from Prime Capital (defined in the LOC Agreement as the "Project LOC Amount"), and a $1 million fee due to Prime Capital (defined in the LOC Agreement as the "LOC Fee").[28] The Indigo ICA was established for the purpose of satisfying interest payments under the line of credit loan (the "LOC"). The maturity date under the LOC Agreement was the fifth year anniversary of the closing date. Upon information and belief, the closing date under the LOC Agreement was June 2, 2022.

90. Pursuant to the Promissory Note, dated June 2, 2022 (the "Note"), Indigo promised

[28] In accordance with the terms of the LOC Agreement, Prime Capital was entitled to a $1,000,000 fee:

> **LOC Fee**. "At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to FIVE percent (5%) multiplied by the Project LOC Amount, which is equal to ONE MILLION Dollars ($1,000,000.00) (the "**LOC Fee**"). The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

LOC Agreement, § 3.10.

to pay to Prime Capital the sum of $21 million or the aggregate unpaid principal amount of all advances, whichever is less, plus interest.

91. In response to Prime Capital's request of what the requested funds are for and how the business will benefit from the transaction, Indigo provided the following information:

> ARX Pharmacy is currently licensed under the FDA's 503A designation and fills prescriptions for **individual** patients referred by over 400 healthcare organizations and physicians. ARX has identified additional growth opportunities to expand the business by selling its compounded formulations **in bulk** to Hospitals, Nursing Homes, Physician offices and other healthcare providers, this can be accomplished with a 503B manufacturing outsourcing facility which is an FDA licensed facility to sell compounded drugs in bulk form.
>
> This spinoff expansion of Indigo Pharmaceutical, LLC in Nevada from ARX pharmacy will be a combination of 503A and 503B designations. Indigo will also be a WO/MOB (Women Owned/Minority Owned Business); SBA 8A designation capturing all the federal mandated business. Currently there are no WO/MOB in pharmaceutical manufacturing companies.
>
> Prospective 503B customers have signaled pinned-up demand for purchasing ARX's formulations in bulk. In addition, there are many opportunities to export these medications to other countries. The FDA certification is the "Gold Standard" throughout the world.
>
> Indigo will also repatriate some of the current pharmaceutical manufacturing back to the USA. For many years more and more pharmaceuticals have been manufactured abroad in countries like China. If we have learned anything in the last couple of years as a country, it is vital to have our own pharmaceutical manufacturing capabilities within our borders. This Loan would let us construct outfit/equip and start production of these medications that sometimes are in very short supply.

LOC Agreement, Exhibit D.

92. According to an article published in Expansion Solutions Magazine on June 30, 2023, Indigo planned to establish a pharmaceutical research, development, and manufacturing facility in Las Vegas and intended to create high-paying, high-quality jobs in Las Vegas after being approved for state tax incentives.

93. In order to secure the payment and performance of all Indigo's obligations under

the LOC Agreement, on or about June 2, 2022, Indigo and Prime Capital entered into a Security Agreement (the "Security Agreement"), whereby Indigo pledged and granted a continuing first priority lien and security interest in favor of Prime Capital in and to all of Indigo's right, title and interest in the following collateral (the "Collateral"):

> all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and
>
> all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

Security Agreement, § 2.

94. The schedules to the Security Agreement, which were supposed to be lists of certain Collateral, were left blank in the Security Agreement in Plaintiff's possession.

95. It does not appear that Prime Capital recorded any UCC-1 filings with the Nevada Secretary of State or filed any assignments with the United States Patent and Trademark Office.

96. Addendum A to the LOC Agreement required Indigo to pay the Indigo ICA on the following payment schedule: (i) $1 million due within 24 hours after the fully executed LOC Documents (as defined in the LOC Agreement) and (ii) $3 million by June 23, 2022.

97. On June 3, 2022, ARK transferred $1 million into Prime Capital's KeyBank account ending in 2233 (the "KeyBank 2233 Account").

98. Prime Capital requested and Truss Financial LLC ("Truss") agreed to provide

bridge funding for half of the Indigo ICA, totaling $2 million, plus interest and fees. Truss is a lending business located at 450 West Nyack Road, Suite 310, West Nyack, New York.

99. On or around July 15, 2022, Indigo and Truss entered into a Secured Promissory Note (the "Truss Note"), whereby Truss agreed to loan $2,625,000.00 to Indigo.

100. Subject to the terms of the Truss Note, Truss funded $2 million of the loan directly to the Indigo ICA. Note, § 2. The remaining loan funds were to be disbursed as follows: (i) $62,500.00 to Truss in partial satisfaction of the origination fee due to Truss, (ii) $62,500.00 to Phoenix GC, LLC in full satisfaction of the broker fee, and (iii) $500,000.00 to an account held at Truss to be held for the benefit of Indigo as a reserve for payment of amounts due under the Truss Note. *Id.*

101. The interest rate under the Truss Note was 33% per month. *Id.* at §§ 5.1, 1.1. The maturity date under the Truss Note was defined as (a) the date of funding the Indigo ICA and (b) the date on which all amounts due under the Truss Note become due and payable. *Id.* at § 1.1.

102. On or about July 19, 2022, Prime Capital, Indigo and Truss entered into an Intercreditor Agreement (the "Intercreditor Agreement") setting forth their lien and security priorities with respect to Prime Capital's advances to Indigo.

103. On July 22, 2022, Truss funded $2 million of the Indigo ICA to the KeyBank 2233 Account.

104. Upon information and belief, Prime Capital did not require Indigo to fund in cash the remaining $1 million of the Indigo ICA. Instead, a book entry was created, whereby the remaining balance due on the Indigo ICA was funded through the initial tranche advanced to Indigo. On August 31, 2022, Humphrey confirmed in a text message to Dr. Friedman that the Indigo ICA was fully funded.

105. Prime Capital advanced the loan to Indigo under the LOC Agreement through the Transfers identified on Exhibit A, totaling $19,247,500.00.

***(ii) Aiding and Abetting the Fraud***

106. In an over 9-minute promotional video published by Prime Capital on YouTube and other social media outlets on or around April 20, 2023, Prime boasted that it "just funded Indigo Pharmaceutical for $20,000,000"[29] (the "Indigo Video"):




107. Dr. Friedman, Chairman of Indigo's board, was featured prominently in the Indigo Video:

[29] *See* Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV, [Video], April 20, 2023, https://www.youtube.com/watch?v=GvmECqnuBkY (YouTube) at 0:11.




108. Dr. Friedman provided a lengthy explanation and "sales pitch" for Prime Capital's business model in that video as follows:

> In a normal loan, you put down your 20% and the bank comes in with 80%. With the Prime Capital Ventures loan, you put down your 20% in your ICA [Borrower Prepayment] and Prime Capital Ventures comes in with the full amount. The 100%. The $20 million in my case. So I have now $4 million in an ICA, which is also an interest reserve, which pays my payments and is an asset on my balance sheet, and Prime Capital Ventures gave me $20 million to fund my company. Most people are used to putting the money in escrow and then waiting and waiting and waiting. Am I going to get the commitment? Am I not going to get the commitment? Am I going to get the loan? Am I not going to get the loan? And every time you get a commitment it could be Swiss cheese because for whatever reason they don't want to do it anymore which happened to me once. . . . So with Prime, they're as committed as much as we are because we put the money in that's true, but the money goes into a trust and you wait for the documentation of a trust meaning that you have already been accepted. It is just a matter of time until you get funded. So once you understand that, although you're waiting, and that can sometimes can give people agita, but you know that the loan is going to come through because the trust has accepted all your documentation in advance and you know whether its 60 or 90 days, banking days actually, **you are going to get funded. It's just a matter of time.**

*See* Id. at 2:50 (emphases added) (transcribed by counsel).

109. Throughout the video, Dr. Friedman praised Prime Capital's business model and

indicated that his entire loan had been funded. Dr. Friedman encouraged parties to do business with Prime:

> When we had the 90 days and the documents came in we got our funding in the manner that was promised in the contract so you have to look at the contract and understand the contract first and then plan accordingly with what's written in your contract and **everything came through with flying colors**.

*See* Id. at 5:38 (emphases added) (transcribed by counsel).

> **I do understand some people's hesitancy but we went through the process and it was really if you understand how it works it actually worked and we were very happy with it.** And we we love our relationship with Prime Capital Ventures and we have the financing. It really is just a different way like you have a different recipe for making the same thing. It's just a different way of getting your financing but you have to overcome the old prejudices. So once you do that it's simple and it's less tedious and you know in advance when you're going to get X number of dollars and you never have the chance of a callback or anything like that like some banks have done in previous ventures. So I was very comfortable with Prime Capital Ventures. We were very very happy how it it ended up with all of our financing and we look forward to doing other deals. Although we're going to make other factories and manufacturing facilities and we hope to utilize Prime Capital Ventures in the future. I wanted to thank Kris for you know creating this great program and you know hopefully we'll do a lot more business together in the future and maybe even they'll come down and see the fruits of our labor. And so I really thank you very much for the opportunity and for everything you've done for us and ultimately for the American people because they're going to have a good line of pharmaceuticals and we're going to keep on growing and growing and doing the best we can for the American people and their medications.

*See* Id. at 7:20 (emphases added) (transcribed by counsel).

110. Despite what Dr. Friedman said in the Indigo Video, in reality it was a constant struggle for Indigo to receive money from Prime Capital from the very beginning which is evident from the text messages between Dr. Friedman and Humphrey as follows:

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 8/11/2022 | 9:56:37 AM | Dr. Friedman | Humphrey | Hi Kimmy<br>Can u give any information on the funding<br>Ty<br>Murray |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 8/11/2022 | 3:34:44 PM | Dr. Friedman | Humphrey | Please call me |
| 8/11/2022 | 4:45:58 PM | Dr. Friedman | Humphrey | Kimmy please answer or at least please text me what is going on<br>This is extremely frustrating |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 9/15/2022 | 11:43:22 AM | Dr. Friedman | Humphrey | Hi Kimmy another week has gone by<br>Is there any movement on my deal? |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 9/19/2022 | 11:08:14 AM | Dr. Friedman | Humphrey | Kimmy<br>Can I please have an update? |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 9/19/2022 | 3:40:55 PM | Dr. Friedman | Humphrey | Did you get an answer from Kis<br>Please Kimmy<br>I need to move forward |
| 9/19/2022 | 8:49:35 PM | Dr. Friedman | Humphrey | Please Kimmy<br>Is there anyway I can find out where I stand<br>Did you speak to Kris |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 9/22/2022 | 12:31:27 PM | Dr. Friedman | Humphrey | Hi Kimmy<br>Another week gone by<br>Is there any information on funding |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 9/28/2022 | 11:20:55 AM | Dr. Friedman | Humphrey | Pls answer if I can get these funds asap |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 9/30/2022 | 4:44:21 PM | Dr. Friedman | Humphrey | Please Kimmy<br>The Chase wire room closes in 16 minutes<br>Please!!!!<br>Wire room closed<br>Funds did not come in<br>😢<br>Called you 10 times today<br>You said the wire is not a problem Kris will fund it<br>Why is this so hard<br>Why can't you answer even 1 of my texts |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 10/7/2022 | 1:15:45 PM | Dr. Friedman | Humphrey | Hi Kimmy<br>Any news on funds transfers |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 10/13/2022 | 3:21:14 PM | Dr. Friedman | Humphrey | Hi Kimmy<br>Just a reminder for the wire<br>So far it has not been received nor is it pending<br>Ty again for all your efforts |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 11/3/2022 | 11:42:00 AM | Dr. Friedman | Humphrey | Nothing came in<br>Please wire funds<br>Ty |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 11/4/2022 | 11:45:09 AM | Dr. Friedman | Humphrey | Please Kimmy<br>I still have not received the wire |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 11/7/2022 | 9:04:50 AM | Dr. Friedman | Humphrey | GM Kimmy<br>I hope you had a good weekend<br>Please remember to send wire<br>Ty |
| 11/7/2022 | 1:49:13 PM | Dr. Friedman | Humphrey | Kimmy<br>Please let me know about that wire that is supposed to come today!!!<br>Kimmy<br>Can you please answer |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 11/21/2022 | 8:35:47 AM | Dr. Friedman | Humphrey | GM Kimmy<br>I hope you had a great weekend<br><br>Hopefully your call with Kris went well and he authorized the payments<br>Please please send over the payments today<br>I need to start the negotiations with the Pharma's<br>Ty<br>Murray |
| 11/21/2022 | 5:50:05 PM | Dr. Friedman | Humphrey | Hi Kimmy<br>Please call me and let me know what's going on |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 11/22/2022 | 10:52:46 AM | Dr. Friedman | Humphrey | GM Kimmy<br>Last Friday you got off the phone with me because Kris was calling you<br>You said you would call me back<br>I am still waiting<br>I have asked for 2 weeks now everyday to get my second Tranche which is $3M<br>Isn't bad enough I had to wait 4 months or all 90 business days<br>Why can't a wire go out today?! |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 11/28/2022 | 1:26:45 PM | Dr. Friedman | Humphrey | Please confirm that prime is sending $3 M which is Trance 2 to the Indigo account<br>Please answer my texts or phone calls |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 2/13/2023 | 7:09:44 PM | Dr. Friedman | Humphrey | Hi Kimmy<br>The wire did NOT come in today |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 2/14/2023 | 5:27:00 PM | Dr. Friedman | Humphrey | Can you please get back to me about the wire<br>What is going on? |
| 2/14/2023 | 6:27:37 PM | Dr. Friedman | Humphrey | It is absolutely not right<br>To ignore my phone calls and texts<br>I am a client like all others that you spent hours on calls with<br>I deserve at least a little bit of communication!!! |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 5/10/2023 | 3:42:26 PM | Dr. Friedman | Humphrey | Please Kimmy<br>I need some information<br>I need the funds asap!!! |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 5/11/2023 | 1:33:05 PM | Dr. Friedman | Humphrey | Were you able to ask Kris about my funds being released<br>I need them ASAP |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 5/17/2023 | 5:10:32 PM | Dr. Friedman | Humphrey | Kimmy please send the funds ASAP!! N |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 5/18/2023 | 11:40:35 AM | Dr. Friedman | Humphrey | Can you please answer your phone or texts or emails |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 5/23/2023 | 12:49:47 PM | Dr. Friedman | Humphrey | Kimmy<br>I still did not get a call with Kris and I did not get the 1.5 M as per contract.<br>This is really not right<br>I have vendors to pay and you are putting me in a very bad position |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 5/24/2023 | 12:12:06 PM | Dr. Friedman | Humphrey | Kimmy<br>I still have not received a call from Kris on the funds |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 6/2/2023 | 2:57:20 PM | Dr. Friedman | Humphrey | Kimmy<br>Please confirm with Kris that the funds are coming today |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 6/5/2023 | 9:30:19 AM | Dr. Friedman | Humphrey | Kimmy GM<br>Please get Kris to send the wire |
| 6/5/2023 | 6:20:15 PM | Dr. Friedman | Humphrey | I have to pay bills<br>I have waived for 2 months extremely patiently |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 6/14/2023 | 11:56:39 AM | Dr. Friedman | Humphrey | Hi Kimmy<br>Can I get any kind of update |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 6/16/2023 | 10:39:26 AM | Dr. Friedman | Humphrey | This is what I sent Kris yesterday<br><br>Kris<br>You promised me you would get back to me last Frida with an update.<br>Never happened<br>I have called and texted all week this week no update |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 6/22/2023 | 12:22:21 PM | Dr. Friedman | Humphrey | Hi Kimmy another week gone by with not a word from Kris or an update of when I will receive our funds |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 6/26/2023 | 3:46:57 PM | Dr. Friedman | Humphrey | Kimmy can someone tell me what is going on<br>No Communication is much worse than bad communication |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 6/27/2023 | 12:19:42 PM | Dr. Friedman | Humphrey | Hi Kimmy<br>What is the problem<br>Why is there no communication |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 6/28/2023 | 11:31:52 AM | Dr. Friedman | Humphrey | Still no call<br>Kimmy Just tell me do I have to have my attorney send a letter<br>It is almost 3 months late |
| 6/28/2023 | 8:00:35 PM | Dr. Friedman | Humphrey | Do I have to sue the company!!! |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 6/29/2023 | 9:02:04 AM | Dr. Friedman | Humphrey | Remember to call me back before you go on to next meeting or call<br>This is very serious!!! |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 7/6/2023 | 4:02:32 PM | Dr. Friedman | Humphrey | Kimmy<br>You said we would be getting money this week |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 7/10/2023 | 9:39:19 AM | Dr. Friedman | Humphrey | Hi Kimmy<br>Still did not get any money<br>Please answer my call<br>Money was promised last week<br>This is a new week<br>This was sent to Kris<br><br>Kris<br>I do not have words for your lack of communication<br>Do I have to have my attorney start sending letters and go thru the process<br>Kimmy said 2 weeks ago I would start getting some money last week<br>That obviously did not happen<br>Now what is going to happen this week? |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 7/18/2023 | 10:58:33 AM | Dr. Friedman | Humphrey | Kimmy<br>I don't need empty promises<br>Kris said I would get money last week that again did not happen<br>Texted yesterday no answer |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 7/19/2023 | 4:45:40 PM | Dr. Friedman | Humphrey | Hello<br>No answer |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 7/20/2023 | 4:31:22 PM | Dr. Friedman | Humphrey | Kimmy<br>What is going on!!?? |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 7/21/2023 | 5:23:53 PM | Dr. Friedman | Humphrey | Now you are ghosting me as well |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 7/24/2023 | 10:54:05 AM | Dr. Friedman | Humphrey | Kimmy<br>Still waiting for some kind of communication |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 7/26/2023 | 1:15:50 PM | Dr. Friedman | Humphrey | Kimmy<br>I have received no communication from you or Kris |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 7/31/2023 | 10:30:39 AM | Dr. Friedman | Humphrey | GM Kimmy<br>Please update me on the funds?<br>Is it today/tomorrow? |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 8/1/2023 | 10:57:01 AM | Dr. Friedman | Humphrey | Hi Kimmy<br>How are we doing with the funds<br>Last week you said Tuesday |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 8/2/2023 | 7:09:05 PM | Dr. Friedman | Humphrey | Please Kimmy |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 8/3/2023 | 8:10:13 AM | Dr. Friedman | Humphrey | Another week goes by this is ridiculous |
| 8/3/2023 | 1:43:50 PM | Dr. Friedman | Humphrey | Kimmy<br>I need an update<br>I need the money!!!! |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 8/4/2023 | 11:14:37 AM | Dr. Friedman | Humphrey | Kimmy<br>Can you please answer your calls or your texts or emails<br>What is going on? |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 8/7/2023 | 6:05:59 PM | Dr. Friedman | Humphrey | Kimmy<br>What the hell is going on |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 9/11/2023 | 12:42:28 PM | Dr. Friedman | Humphrey | Kimmy<br>You really want this to go to a lawsuit<br>Really!?? |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 11/15/2023 | 1:53:16 PM | Dr. Friedman | Humphrey | Hi Kimmy<br>Please send payment |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 11/21/2023 | 9:52:29 AM | Dr. Friedman | Humphrey | Kimmy<br>Please send the money |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 11/29/2023 | 1:20:56 PM | Dr. Friedman | Humphrey | Kimmy<br>When are you sending the next payment it has been 4 weeks |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 12/10/2023 | 6:05:21 PM | Dr. Friedman | Humphrey | I sent you an invoice last Thursday<br>Please send the funds tomorrow<br>900k still owed |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 12/11/2023 | 10:28:27 AM | Dr. Friedman | Humphrey | Hi Kimmy<br>Please call me and let me know when you are sending funds |
| 12/11/2023 | 4:04:09 PM | Dr. Friedman | Humphrey | Kimmy<br>I sent over the invoice for our fill line. Please send over the funds. This is very disconcerting that I have to wait months and months and months. I gave you wring information two weeks ago and you said you were going to wire it over. |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 12/12/2023 | 11:00:56 AM | Dr. Friedman | Humphrey | Kimmy<br>Please send funds |
| 12/12/2023 | 12:28:29 PM | Dr. Friedman | Humphrey | The last time funds were sent was October<br>This is RIDICULOUS!!!<br>I will tell you my attorney to just file the suit<br>I gave you what you want either send funds or we file the suit!!! |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 12/13/2023 | 9:43:29 AM | Dr. Friedman | Humphrey | GM Kimmy<br>Is Kris sending funds or not?! |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 12/14/2023 | 3:21:40 PM | Dr. Friedman | Humphrey | Nothing came in |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 12/18/2023 | 9:57:40 AM | Dr. Friedman | Humphrey | Hi Kimmy<br>Nothing came in on Friday<br>I do not have time for games |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 1/10/2024 | 2:18:39 PM | Dr. Friedman | Humphrey | Kimmy<br>What is going on<br>I need my funds!!! |

111. Dr. Friedman did not reveal any issues obtaining the funding from Prime Capital in the Indigo Video. To the contrary, Dr. Friedman affirmative represented in the Indigo Video that "[w]e got our funding in the manner that was promised in the contract" and that "[w] were very very happy how it ended up with all our financing". Dr. Friedman's representations in the Indigo Video were unequivocally false. In fact, Indigo had not received all of its promised funding at the time the Indigo Video was made and it never did.

112. In addition to appearing in the promotional video, Dr. Friedman agreed to speak with potential victims of Prime Capital to assure them that Prime Capital was a safe and reliable lender:

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 2/8/2023 | 11:36:02 AM | Humphrey | Dr. Friedman | Also I have a potential client that wants to talk to a current client. Would you be so king as to speak w them? |
| 2/8/2023 | 11:36:02 AM | Humphrey | Dr. Friedman | Hey would you mind doing a reference call? |
| 2/8/2023 | 11:36:02 AM | Dr. Friedman | Humphrey | No problem |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 2/17/2023 | 2:02:56 PM | Humphrey | Dr. Friedman | Hey Murray. Any way you can take a quick client reference call. They are about to close and stressed out they have to wire in 4.2m to their ICA and asking to speak w someone. If you can't do it bc you're out of the country that is totally fine. Just wanted to ask |
| 2/18/2023 | 2:46:49 PM | Dr. Friedman | Humphrey | Yes<br>I am 7 hrs ahead of Ny time<br>Tell them to text or WhatsApp me<br>I will call them back to set up a time |

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 2/27/2023 | 11:43:01 AM | Humphrey | Dr. Friedman | Eli Baron.vcf |
| 2/27/2023 | 11:43:01 AM | Dr. Friedman | Humphrey | Okay I will call a little later |
| 2/27/2023 | 11:43:01 AM | Dr. Friedman | Humphrey | I tried calling him<br>Went to VM |
| 2/27/2023 | 11:43:01 AM | Humphrey | Dr. Friedman | He was in a dead zone. He's going to call you |
| 2/27/2023 | 11:43:01 AM | Dr. Friedman | Humphrey | I just spoke to him |

113. Upon information and belief, at least one or more current creditor victims of Prime Capital viewed the Indigo Video and made their decision to provide an ICA Deposit on the Indigo Video and representations made by Dr. Friedman therein.

***(iii)Indigo Appears to be Defunct***

114. Indigo does not appear to be an active company and over the past year has had numerous default judgments entered against it. *See* https://esos.nv.gov/EntitySearch/BusinessInformation (entity status for Indigo listed as "Default"); *Affordable Concepts Inc vs. Indigo Pharmaceutical LLC,* Case No. A-26-936779 (Nevada District Court, Clark County) (default judgment obtained against Indigo on May 13, 2026); *ARL Bio Pharma, Inc. an Oklahoma for profit corporation vs. Xenith Pharmaceutical, d/b/a Indigo Pharmaceutical, LLC*, Case No. CV-2025-5838 (Oklahoma District Court) (default judgment obtained against Indigo on November 13, 2025); *Great American Financial vs. Indigo Pharmaceutical et al.,* Case No. 06571 LACV 107960 (Iowa District Court, Linn County) (default judgment obtained against Indigo on August 12, 2025).

## FIRST CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Avoidance of Actual Fraudulent Transfers** |
| **Statute or Common Law:** | **11 U.S.C. §§ 544(a) and 548(a)(1)(A); NY DCL § 273(a)(1) (NY UVTA)** |
| **Affected Defendants:** | **All Defendants Except Dr. Friedman** |

115. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 114 of this Complaint as if fully set forth at length herein.

116. The Transfers listed on Exhibit A constituted transfers of money, property, and value of Prime Capital.

117. At the time each of the Transfers was made, Prime Capital had incurred or was about to incur a liability which remains unpaid to this day.

118. Each of the Transfers was made intentionally by Prime Capital and its principals in furtherance of Prime Capital's Ponzi scheme and in order to keep the fraud from being discovered.

119. Each of the Transfers was made without consideration, or with significantly inadequate consideration, to Prime Capital.

120. Through the video advertisement for Prime Capital that was published on YouTube and used by Prime Capital to dupe new victims, Dr. Friedman encouraged parties to do business with Prime and agreed to talk to potential clients of Prime Capital, despite struggling to receive funds from Prime Capital and threatening litigation.

121. Prime Capital was a Ponzi scheme since its inception and never had any assets or funds that were not obtained by its victims under fraudulent pretenses or purchased with the proceeds of the fraud. Accordingly, Prime Capital was at all times insolvent and had no capital.

122. Each of the Transfers was made by Prime Capital, at the direction of its principals, with actual intent to hinder, delay, and/or defraud Prime Capital's creditors and victims, and

individuals and entities to which Prime Capital would become obligated.

123. Each Defendant was an initial transferee of one of the Transfers or an entity for whose benefit the Transfers were made.

124. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against each recipient of the Transfers or a beneficiary of the Transfers avoiding the Transfers and directing that the subject of the Transfers or their value be returned to Prime Capital's bankruptcy estate for the benefit of its victims, together with interest and fees thereon.

---

## SECOND CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Avoidance of Constructive Fraudulent Transfers** |
| **Statute or Common Law:** | **11 U.S.C. §§ 544(a) and 548(a)(1)(B); NY DCL §§ 273(a)(2) and 274(a) (NY UVTA)** |
| **Affected Defendants:** | **All Defendants Except Dr. Friedman** |

---

125. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 124 of this Complaint as if fully set forth at length herein.

126. The Transfers listed on Exhibit A constituted transfers of money, property, and value of Prime Capital.

127. Each of the Transfers was made without reasonably equivalent value to Prime Capital.

128. At the time each of the Transfers was made, Prime Capital had incurred or was about to incur a liability which remains unpaid to this day.

129. At the time that it made each of the Transfers, Prime Capital: (i) was insolvent or became insolvent as a result of the Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Prime Capital

was an unreasonably small capital; and/or (iii) intended to incur, or believed that Prime Capital would incur debts that would be beyond Prime Capital's ability to pay as such debts matured.

130. Each Defendant was an initial transferee of one of the Transfers or an entity for whose benefit the Transfers were made.

131. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against each recipient of the Transfers or a beneficiary of the Transfers avoiding the Transfers and directing that the subject of the Transfers or their value be returned to Prime Capital's bankruptcy estate for the benefit of its victims, together with interest and fees thereon.

## THIRD CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Attorneys' Fees for Avoidance of Constructive Fraudulent Transfers or Actual Fraudulent Transfers** |
| **Statute or Common Law:** | **11 U.S.C. § 544(a); NY DCL § 276-a (NY UVTA)** |
| **Affected Defendants:** | **All Defendants Except Dr. Friedman** |

132. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 131 of this Complaint as if fully set forth at length herein.

133. The Transfers were fraudulent transfers made in furtherance of Prime Capital's fraud with actual intent to hinder, delay, and defraud present and future creditor victims.

134. Each of the Transfers was made without reasonably equivalent value to Prime Capital.

135. At the time each of the Transfers was made, Prime Capital had incurred or was about to incur a liability which remains unpaid to this day.

136. At the time that it made each of the Transfers, Prime Capital: (i) was insolvent or became insolvent as a result of the Transfers; (ii) was engaged in business or a transaction, or was

about to engage in business or a transaction, for which any property remaining with Prime Capital was an unreasonably small capital; and/or (iii) intended to incur, or believed that Prime Capital would incur debts that would be beyond Prime Capital's ability to pay as such debts matured.

137. Based upon the foregoing, the Plan Administrator is entitled to recover reasonable attorneys' fees pursuant to NY DCL § 276-a.

---

**FOURTH CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Recovery of Avoidable Transfers or Value Thereof From All Initial, Immediate or Mediate Transferees** |
| **Statute or Common Law:** | **11 U.S.C. § 550(a)** |
| **Affected Defendants:** | **All Defendants Except Dr. Friedman Unless he is one of the John or Jane Does** |

---

138. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 137 of this Complaint as if fully set forth at length herein.

139. Upon avoidance of each of the Transfers, the Plan Administrator is entitled to recover for the benefit of the estate the property transferred, or the value thereof, from the initial transferee, the individual or entity for whose benefit such transfer was made, or any immediate or mediate transferee of such initial transferee.

140. Each Defendant was an initial transferee of one of the Transfers or an entity for whose benefit the Transfers were made.

141. Based upon the foregoing, the Plan Administrator is entitled to a judgment against each recipient of a Transfer, any beneficiary of such Transfers, and any subsequently identified immediate or mediate transferee of such initial transferee of the Transfers, for the full value of the applicable Transfer.

**FIFTH CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Unjust Enrichment** |
| **Statute or Common Law:** | **Common Law** |
| **Affected Defendants:** | **All Defendants Except Dr. Friedman** |

142. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 141 of this Complaint as if fully set forth at length herein.

143. Each of the Transfers constituted a transfer of an interest of Prime Capital in property within the meaning of section 101(54) of the Bankruptcy Code.

144. Prime Capital made the Transfers to, or for the benefit of the Defendants, thus conferring benefits upon it in the amount of the value of the Transfers.

145. The Defendants knowingly and voluntarily accepted and retained the benefits conferred upon it by Prime Capital while knowing that it did not provide fair consideration or reasonably equivalent value to Prime Capital in exchange for the Transfers.

146. The Defendants have been unjustly enriched at the expense of Prime Capital, its estate and creditors.

147. It would be inequitable and unjust for the Defendants to retain the benefits conferred upon them in these circumstances.

148. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against the Defendants on account of the value of the Transfers made by Prime Capital, directing the Defendants to pay the value of such benefits to the Plan Administrator.

## SIXTH CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Aiding and Abetting Fraud** |
| **Plaintiff Standing:** | **Plan Administrator, as Assignee of the Claims of Creditors** |
| **Statute or Common Law:** | **Common Law** |
| **Affected Defendants:** | **Indigo and Dr. Friedman** |

149. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 148 of this Complaint as if fully set forth at length herein.

150. Pursuant to the confirmed Plan, creditors of Prime Capital were given the opportunity to assign certain claims to the Plan Administrator for investigation and pursuit. See Plan, §4.2.

151. The form of assignment provided for the assignment of claims described as follows:

> The undersigned, a holder of a Class 2 General Unsecured Claim (a "Creditor") against Prime Capital Ventures, LLC (the "Debtor"), or an assignee, heir, successor, or duly authorized estate representative of such Creditor, does hereby irrevocably assign, give over, transfer, and convey, to the Plan Administrator appointed in the Trustee's Plan of Liquidation Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"), any and all claims, demands, causes of action, class in action, and other obligations of any type or description, whether known or unknown, liquidated or unliquidated, asserted or unasserted, whether arising in tort, contract or other basis or theory, which the undersigned has or may have that are related to the Debtor's and Kris Roglieri's ("Roglieri") conduct of the Debtor's business, and the Creditor's claim against the Debtor's or Roglieri's bankruptcy estates. Such claims include, but may not be limited to: (i) any claims against the Debtor's former attorneys, accountants, auditors, or other professionals, in connection with aiding and abetting any breach of fiduciary duty owed by Roglieri to the Debtor or the Debtor's creditors, fraud, aiding and abetting fraud on the part of the Debtor or Roglieri, or otherwise; (ii) any claims against banks or any other financial institutions used by the Debtor or Roglieri, or that are involved in transactions with the Debtor, in connection with aiding and abetting any breach of fiduciary duty owed by Roglieri to the Debtor or its creditors, fraud, aiding and abetting fraud on the part of the Debtor or Roglieri, unjust enrichment, aiding and abetting conversion by the Debtor or Roglieri, or otherwise; and (iii) any other claims against third parties related to the Debtor's or Roglieri's wrongdoing that if pursued by the Debtor or its estate may be subject to the defense of *in pari delicto* or the Wagoner Rule (collectively, the "Assigned Claims").

> The assignment of the Assigned Claims is made without warranty or representation of any kind other than that undersigned represents that the Assigned Claims have not previously been assigned or conveyed to any other persons. This assignment is subject to the relevant provision of the Plan and incorporates provisions by reference.

152. To date, several creditors of Prime Capital have executed and delivered assignments of claims to the Plan Administrator including 526 Murfreesboro, LLC, Camshaft CRE 1 LLC, Compass-Charlotte, CoNextions Medical Inc., ER Tennessee, HCW Biologics Inc., Onward Holding, LLC, and Piper Capital Funding, LLC (the "Assigning Creditors").

153. Accordingly, the Plan Administrator as assignee is fully empowered to assert any claims against the Defendants that may have belonged to the Assigning Creditors.

154. This Cause of Action is asserted by the Plan Administrator in his capacity as the assignee of claims against Indigo and Dr. Friedman by the Assigning Creditors.

155. Prime Capital wrongfully asserted dominion and control over the funds of the Assigning Creditors. The Assigning Creditors were told that their funds or "ICA Deposits" would be held and maintained for its benefit for the purpose of servicing interest on the loans they were to receive from Prime Capital. In reality, the Assigning Creditors' funds were used to, among other things, fund Prime Capital's loan to Indigo and to make lavish personal expenditures for Roglieri, Humphrey, and Snyder.

156. Indigo and Dr. Friedman had actual knowledge of Prime Capital's fraudulent enterprise. As described in more detail above, this actual knowledge came from, *inter alia*, Prime Capital's inability or unwillingness to fund the loan to Indigo, and Dr. Friedman's personal challenges in getting promised funding from Prime Capital.

157. Indigo and Dr. Friedman rendered substantial assistance to, and aided and abetted Prime Capital's fraudulent scheme, by making numerous fraudulent statements and misrepresentations in the published and publicly available Indigo Video advertisement touting the

purported propriety of Prime Capital's business.

158. Assigning Creditors Compass-Charlotte, HCW Biologics Inc., and Piper Capital Funding, LLC, and ER Tennessee provided ICA Deposits to Prime Capital after the Indigo Video was published. Upon information and belief, one or more of those creditors viewed the Indigo Video and made their decision to fund an ICA Deposit in whole or in part on the contents of that video and specifically, Dr. Friedman's false statements and misrepresentations made therein. Simply put, Prime Capital's fraud could not have happened and continued without Indigo's and Dr. Friedman's substantial assistance.

159. Indigo and Dr. Friedman were incentivized to and did in fact render substantial assistance to Prime Capital in perpetrating its fraud in order to ensure that they received the funding that they were promised. Had they not rendered such assistance, Prime Capital may not have raised the necessary funds through fraud or otherwise been incentivized to continue to fund Indigo.

160. Had Indigo and Dr. Friedman spoken the truth or refused to make the Indigo Video full of false representations, and refused to talk to prospective victims of Prime Capital, Prime Capital would have been unable to attract some or all of its later victims.

161. Indigo and Dr. Friedman are liable for all damages actually and proximately caused to Prime Capital's Assigning Creditors, and Prime Capital's bankruptcy estate as assignee and proxy, as a result of Prime Capital's fraud against Assigning Creditors who based their decision to send funds to Prime Capital, and the Plan Administrator is entitled to a judgment against Indigo and Dr. Friedman thereon for which each is jointly and severally liable, together with pre-judgment interest and costs.

## SEVENTH CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Pre-Judgment Interest and Attorneys' Fees** |
| **Statute or Common Law:** | **Mixed – 11 U.S.C. § 550(a); 28 U.S.C. § 1961; NY CPLR §§ 5001 and 5004** |
| **Affected Defendants:** | **All Defendants** |

162. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 161 of this Complaint as if fully set forth at length herein.

163. The Plan Administrator is entitled to a judgment awarding him pre-judgment interest with respect to the claims asserted in this Complaint from the inception of the relevant cause of action to the date of judgment.

[*Continued on Next Page*]

**WHEREFORE**, the Plaintiff demands judgment against the Defendants as follows:

A. Against Indigo Pharmaceutical, LLC on the First, Second, Fourth and/or Fifth Causes of Action in an amount not less than $19,247,500.00;

B. Against Drawbridge Capital LLC on the First, Second, Fourth and/or Fifth Causes of Action in an amount not less than $200,000.00, with joint and several liability with Indigo Pharmaceutical, LLC;

C. Against John and Jane Does 1 to 10 on the Fourth Cause of Action, presuming a judgment is entered against one or more of the Defendants on the First and/or Second Causes of Action, in the amount of the value of any immediate, mediate or subsequent transfer of Prime Capital's funds;

D. Against Indigo Pharmaceutical, LLC and Dr. Murray Friedman on the Sixth Cause of Action in an amount to be determined at trial but estimated to be not less than $30,000,000.00, for which each is jointly and severally liable therefor;

E. Against Indigo Pharmaceutical, LLC, Dr. Murray Friedman and Drawbridge Capital LLC on the Third and Seventh Causes of Action, an amount to be determined at trial on account of all attorneys' fees, costs, and prejudgment interest; and

[*Continued on Next Page*]

F. Granting the Plan Administrator such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 15, 2026

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**

By: */s/ Fred Stevens*

Fred Stevens
Lauren C. Kiss
Kevin B. Collins
286 Madison Avenue, 11th Floor
New York, New York 10017
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: fstevens@klestadt.com
lkiss@klestadt.com
kcollins@klestadt.com

*Counsel to the Plaintiff Plan Administrator*

# Exhibit A[1]

| Date | Transferor | Transfer Source Account Number | Transferee | Amount |
|---|---|---|---|---|
| 8/30/2022 | Prime Capital Ventures, LLC | KeyBank 2233 Account | CJI Trading LLC | $3,048,750.00 |
| 10/4/2022 | Prime Capital Ventures, LLC | Citibank 6945 Account | Indigo Pharmaceutical, LLC | $1,000,000.00 |
| 10/4/2022 | Prime Capital Ventures, LLC | Citibank 6945 Account | Indigo Pharmaceutical, LLC | $1,000,000.00 |
| 10/13/2022 | Prime Capital Ventures, LLC | Citibank 6945 Account | Indigo Pharmaceutical, LLC | $2,000,000.00 |
| 10/17/2022 | Prime Capital Ventures, LLC | Citibank 6953 Account | Drawbridge Capital LLC | $200,000.00 |
| 10/26/2022 | Prime Capital Ventures, LLC | Citibank 6945 Account | Indigo Pharmaceutical, LLC | $2,000,000.00 |
| 11/7/2022 | Prime Capital Ventures, LLC | Citibank 6945 Account | Indigo Pharmaceutical, LLC | $1,698,750.00 |
| 12/14/2022 | Prime Capital Ventures, LLC | Citibank 6945 Account | Indigo Pharmaceutical, LLC | $3,000,000.00 |
| 2/15/2023 | Prime Capital Ventures, LLC | KeyBank 2233 Account | Indigo Pharmaceutical, LLC | $4,700,000.00 |
| 9/12/2023 | Prime Capital Ventures, LLC | KeyBank 2233 Account | Indigo Pharmaceutical, LLC | $200,000.00 |
| 10/17/2023 | Prime Capital Ventures, LLC | KeyBank 2233 Account | Indigo Pharmaceutical, LLC | $200,000.00 |
| 10/24/2023 | Prime Capital Ventures, LLC | KeyBank 2233 Account | Indigo Pharmaceutical, LLC | $200,000.00 |
| **Total:** | | | | **$19,247,500.00** |

[1] Prime Capital Ventures, LLC KeyBank bank account ending in 2233 (the "KeyBank 2233 Account"); Prime Capital Ventures, LLC Citibank, N.A. bank account ending in 6945 (the "Citibank 6945 Account"); Prime Capital Ventures, LLC Citibank, N.A. bank account ending in 6953 (the "Citibank 6953 Account").